The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Joe L. PARSONS, Defendant–Appellant.

No. 98CA1000.

Colorado Court of Appeals,
Div. V.

June 8, 2000.

Certiorari Denied Dec. 18, 2000.

Ken Salazar, Attorney General, Katherine A. Hansen, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Theodore P. McClintock, Colorado Springs, Colorado; Elizabeth A. McClintock (on the Briefs), Colorado Springs, Colorado, for Defendant–Appellant.

Opinion by Judge KAPELKE.

Defendant, Joe L. Parsons, appeals from the judgment of conviction entered on a jury verdict finding him guilty of first degree murder, conspiracy to commit third degree assault, and tampering with physical evidence. He contends that his conviction must be reversed because: (1) the court erred in denying his motion to suppress statements he made during an "in custody" interrogation without the benefit of a *Miranda* advisement; (2) the court also erred in denying his motion for a private visit with his attorney; and (3) the evidence was insufficient to establish the "after deliberation" element of his first degree murder conviction. We affirm.

The criminal charges against defendant stem from the death by strangulation of an inmate at the Territorial Correctional Facility (the facility) where defendant was incarcerated.

Defendant was charged with first degree murder, conspiracy to commit first degree murder, and tampering with physical evidence. He entered a plea of not guilty.

Prior to trial, defendant filed a motion to suppress evidence, asserting that his statements to the Department of Corrections (DOC) investigators in connection with the killing of the inmate should be suppressed because they were made involuntarily and while he was in custody and without the benefit of an advisement of his *Miranda* rights. Defendant also filed a motion for confidential attorney-client visit, asserting that the visiting room at the Colorado State Penitentiary (CSP) lacked privacy and thus was inadequate for purposes of attorney-client consultation, and requesting that a secure and confidential location be provided for such visits. The trial court denied both motions.

I.

Defendant first contends that the trial court erred in denying his motion to suppress evidence. Specifically, he argues that his interview with the DOC investigators constituted a custodial interrogation and that he was therefore required to be given a *Miranda* advisement. We disagree.

The determination whether an individual has been subjected to a custodial interrogation within the meaning of *Miranda* hinges on whether a reasonable person in the suspect's position would consider himself or herself deprived of freedom of action in a significant way at the time of the interrogation. This determination requires the trial court to consider the totality of the circumstances surrounding the interrogation. *People v. J.D.*, 989 P.2d 762 (Colo.1999).

Our supreme court has recognized that the traditional test of custody is inapplicable in a prison or jail setting "because it would lead to the conclusion that all prison questioning is custodial because a reasonable person would always believe he could not leave the prison freely." *People v. Denison*, 918 P.2d 1114, 1116 (Colo.1996)(quoting *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir.1978)).

In *Denison*, the supreme court discussed the different standard to be applied in determining whether an interrogation conducted in such a setting was "custodial":

> Instead of the traditional "free to leave" standard for custody, the court in *Cervantes* applied a "restriction" standard which, in the prison setting, implies a change in the surroundings of the prisoner that results in an added imposition on his freedom of movement.

*People v. Denison, supra*, 918 P.2d at 1116.

In determining whether an inmate being questioned has been additionally restricted to the extent that he or she is "in custody" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a court must consider the totality of the circumstances and must address the four factors enumerated in *Denison*: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which the individual is confronted with evidence of his or her guilt; and (4) the additional pressures exerted to detain the individual. *People v. J.D., supra; People v. Denison, supra*.

The factors set forth in *Denison*, however, are not necessarily dispositive of the inquiry whether an individual has been

further restricted to such an extent as to be deemed in custody for *Miranda* purposes. Other circumstances a court may consider include: (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) the placement of any limitation of movement or other form of restraint on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) any directions given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. *People v. J.D., supra; see also People v. Dracon,* 884 P.2d 712 (Colo. 1994).

■ If the trial court applies the correct legal standard and there is evidence in the record to support its conclusion, we will not reverse its ruling on appeal. *People v. J.D., supra; People v. Horn,* 790 P.2d 816 (Colo. 1990).

■ Here, in denying defendant's motion, the trial court found that: (1) an inmate of the DOC had been murdered in his cell in cell-house seven (CH–7) at the facility; (2) in order to preserve order and evidence and to facilitate the investigation of the murder, the entire facility had been placed on lockdown; (3) inmates had been confined to their cells and did not have permission to report to job assignments; (4) the lockdown applied not only to CH–7 but to all cell-houses at the facility; (5) prison investigators conducted interviews of a large number of inmates, most of whom had been housed in CH–7; (6) the individual inmate interviews were conducted in various offices or rooms in an administrative building which was located at some distance and across the prison yard from CH–7; (7) each inmate who was interviewed was handcuffed at CH–7, escorted by a guard or guards to the administrative building, released from handcuffs, interviewed while free from restraints, re-cuffed following the interview, and then escorted back to CH–7; and (8) defendant was treated no differently from other inmates in this regard.

In evaluating the circumstances surrounding the interview of defendant by the DOC investigators, the court found that the interview had been conducted in a conference room within the administrative building, and that neither the room itself nor the conduct of the interview by prison investigators was oppressive or coercive. The court further found that defendant and all the other inmates interviewed had been informed that the murder of the victim was the subject of the inquiry, and that the persons conducting the inquiry were DOC investigators. Although no *Miranda* advisement had been given to any of the inmates, no promises or threats, either implied or explicit, had been used to obtain answers from defendant or any other inmate. Defendant had not refused or expressed reluctance to answer questions and had not requested an attorney. He had not been informed that he was a suspect, and the questions posed by the investigators were investigative rather than accusatorial. Upon completion of the interview, defendant had been returned to CH–7.

The trial court addressed the four *Denison* factors in light of the evidence received. The court found that the language used to summon defendant to his interrogation had been no different from that used to summon all the other inmates who were questioned about the murder; that the interrogation had taken place in the non-coercive atmosphere of a conference room; that defendant had not been "significantly confronted" with any evidence of his guilt; and that no additional pressure had been exerted to detain him. The court noted that the circumstance of defendant's having been handcuffed while he was transported to and from the interview was shared by the other inmates and was not oppressive in view of the fact that the entire prison had been placed on lockdown at the time.

Based on its evaluation of the evidence and consideration of the relevant factors, the court determined that, for *Miranda* purposes, defendant had not been in custody during the questioning and that his statements during the interview had been made voluntarily.

In addition to the evidence addressed in the trial court's order, other evidence relating to the circumstances surrounding defendant's interrogation also supports the trial court's conclusions. Although defendant was not interrogated until the morning after the inmate's murder, the DOC investigators were in the ongoing process of interviewing staff members and as many as 200 of the inmates. During defendant's interview, the two DOC investigators were in civilian clothes and were not armed.

According to the evidence presented, the DOC investigators, speaking in a conversational tone, told defendant they were interviewing all the inmates in CH–7 in order to obtain information about the inmate's death. They also told him they were asking all the inmates what they had been doing the night before and the morning of the killing and whether they had heard any rumors about it. They denied threatening defendant in any way or accusing him of being involved in the murder.

Nevertheless, defendant urges that there were factors unique to his interrogation that amounted to "an added imposition on his freedom of movement" so as to require the giving of a *Miranda* advisement. We disagree.

Defendant points to the fact that he was handcuffed while being escorted to the interview and was questioned in a separate building rather than in the familiar surroundings of his cellblock. As discussed, however, these circumstances also applied to all the inmates who were interrogated, and stemmed from the prison facility's having been on lockdown status following the death of the inmate.

Also, defendant urges that his interrogation was a custodial one because he was confronted with evidence of his guilt. This argument is based on the fact that investigators had found a small smear of blood outside the cell occupied by defendant and his cellmate and had asked defendant in his interview what his explanation would be if blood were found on or around his cell. He was not told the blood smear had in fact been found.

While we agree that this aspect of the interview can be viewed as a form of confrontation with evidence of guilt—which is one of the pertinent factors to be considered under *Denison*—it is not dispositive of the inquiry. At the time of the interview, defendant was considered a potential witness rather than a suspect and, as the trial court found, he was treated no differently from all the other inmates questioned.

In *People v. J.D., supra,* the supreme court agreed with the defendant that he had been confronted with evidence of his guilt during the interview. Nevertheless, upon consideration of the totality of the circumstances, the court concluded that the defendant had not been "in custody" during his interrogation.

Under the totality of the circumstances here, we conclude that the trial court properly determined that defendant was not in custody when he was interviewed. Because the court applied the correct legal standard and its findings and conclusions are supported by evidence in the record, we may not disturb its ruling on the motion to suppress. *People v. J.D., supra.*

■ We further reject defendant's argument that reversal is required because the trial court made the following statement in its ruling: "The court does not conclude that this interview, conducted in a cell remote from the crime, and a day later, constituted an on-the-scene investigation." Defendant asserts that before a court may apply the four-part analysis in *Denison* in addressing the custodial nature of an interview within a prison, the court must first find that the interview was part of an on-the-scene investigation.

The location of the interview and the amount of time that had transpired since the offense was committed, however, are but two of the relevant factors to be considered in determining whether the interrogation was custodial. The time and place, standing alone, are not dispositive. Thus, the fact that the interrogation was not conducted immediately and at the very scene of the homicide does not mandate a finding that the interrogation was custodial. *See, People v.*

*J.D., supra* (telephone interview with defendant confined in Nevada juvenile detention facility concerning Colorado robbery held non-custodial).

## II.

Defendant next contends that the trial court erred in denying his motion for a private attorney-client visit. Specifically, he argues that, because the attorney-client visiting room at the CSP lacked privacy and was inadequate for purposes of consultation, he was deprived of his right to confer privately with counsel as guaranteed by § 16–3–403, C.R.S.1999, § 16–3–404, C.R.S.1999, and the Sixth Amendment. We are not persuaded.

Section 16–3–403 provides, as pertinent here:

Any person ... imprisoned ... shall be allowed to consult with an attorney-at-law of this state ... *alone and in private* at the place of custody, as many times and for such period each as is reasonable.

(emphasis added).

Section 16–3–404 provides, in relevant part:

(1) All peace officers or persons having in custody any person ... imprisoned ... shall forthwith admit any attorney-at-law in this state ... to see and consult the person so imprisoned, *alone and in private*, at the jail or other place of custody

. . . .

(2) Any peace officer or person violating the duty imposed by this section or section 16–3–403 shall forfeit and pay not less than one hundred dollars nor more than one thousand dollars to the person imprisoned or to his attorney for the benefit of the person imprisoned, to be recovered in any court of competent jurisdiction.

(emphasis added).

In his motion for a confidential attorney-client visit, defendant requested that he be provided "a secure and confidential place where attorney-client visits can take place without interruption and without intrusion by the State of Colorado."

Following an evidentiary hearing, the trial court made the following findings of fact regarding the visiting room at the CSP:

1. [T]he room is constituted of two portions. The attorney occupies one side, and the inmate/client the other side, and the two sides are separated by a partition. The partition has a pass through for exchange of materials. The attorney and the inmate/client can see each other adequately through the glass partition. They can communicate by spoken word in a normal tone of voice, and in so doing cannot be overheard by those who are outside the room, but who may be in the immediate area.

2. There are presently no security cameras or recording devices which observe or record what occurs in the room, nor have there been any during the pendency of this action.

3. The only security camera in use which relates to this room at all is one which focuses on the door, and it does not allow at all for observation of what occurs within the room.

4. Any guards who may be in the area, are assigned there to roam in the general area, and are not to focus on what occurs in the room. Nonetheless, since the room has windows on three sides, these guards are free to observe and, without doubt, do observe what occurs in the room.

5. At least a portion of what occurs in the attorney/client visiting room can also be seen from several of the nearly adjacent thirteen regular visiting rooms (used by inmates for visits with family or friends).

The court noted in its order that "the true concern of [d]efendant's counsel seems to be limited, and deals with the opportunity of the guards and inmates and their visitors to observe physical actions by the attorney or the client which are meant to be demonstrative or otherwise communicative in nature."

Finding that there had been no showing of an actual intrusion upon the attorney-client relationship, and no showing of prejudice, the court denied defendant's requests. The court acknowledged, however, that "privacy as to necessary non-verbal communication between an attorney and his client is just as

much assured by the Sixth Amendment as is privacy as to spoken and written communications." The court further stated it would "intercede from time to time" to ensure "that such privacy is provided." The court's order provided that defense counsel was to communicate his need for privacy to the court, and the court would then "fashion a remedy to permit such visitation at the courthouse."

Thereafter, defendant filed a motion for a private visit with his counsel at the courthouse for purposes of trial preparation and to review a videotaped statement given by a prosecution witness. Following a hearing, the trial court denied defendant's motion, determining that the visiting room at the CSP afforded him a sufficiently private location to satisfy the purposes of the meeting between defendant and his counsel.

Following the trial court's ruling, defendant filed a petition with the supreme court pursuant to C.A.R. 21, asserting that the trial court had abused its discretion in denying his request for a private visit with his counsel. The supreme court denied the petition.

■ As to defendant's claim that his statutory rights under § 16–3–403 and § 16–3–404 were violated, the only remedy specified for a violation of either statutory section is imposition of a fine for the benefit of the person imprisoned. Neither section affords the aggrieved prisoner the remedy of dismissal of a criminal case. *People v. Dehmer*, 931 P.2d 460 (Colo.App.1996).

■ Also, neither section creates a statutory right to private attorney-client consultation that is broader than that of the corollary constitutional right under the Sixth Amendment. *People v. Dehmer, supra.* Accordingly, we analyze defendant's claims under applicable constitutional standards.

■ In order to prevail on a constitutional claim predicated upon an alleged violation of the Sixth Amendment right to a sufficiently private attorney-client consultation facility, a defendant must demonstrate actual prejudice. *People v. Dehmer, supra.*

■ Here, defendant argues that the trial court abused its discretion and impaired his right to counsel in denying his motion for a private visit with his counsel at the courthouse. Defendant contends that requiring him to meet with his counsel in the prison visitation facility impaired his attorney-client relationship because he was not free to use "physical demonstrations of things that had taken place or [were] alleged to have taken place." We are not persuaded.

The record indicates that, for most purposes of private communication, the room at the DOC was sufficient. Persons outside the room could not overhear conversations, there were no cameras or recording devices, and the guards were instructed not to focus on what occurred in the room.

However, even if the room was unsuitable for the purposes of conducting physical demonstrations in private, the record reveals that defendant was permitted on several occasions to visit with his counsel in the jury room at the courthouse, which was not visually monitored. Although such visits were generally of brief duration, they afforded defendant adequate opportunity to communicate with his counsel in preparation for trial and to carry out any needed physical demonstration.

Accordingly, we conclude that the trial court did not violate defendant's rights in denying his motion for a private visit.

### III.

■ Finally, defendant contends that the evidence was insufficient to satisfy the "after deliberation" element of his conviction for first degree murder. We disagree.

■ When presented with a challenge based on the sufficiency of the evidence, we must determine whether that evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt. *People v. Schoondermark*, 699 P.2d 411 (Colo.1985).

Under § 18–3–102(1)(a), C.R.S.1999, the prosecution must establish not only that the defendant intended to cause the death of another person, but also that he or she acted after deliberation. The term "after deliberation" means "not only intentionally but also

that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act." Section 18–3–101(3), C.R.S.1999; *People v. District Court*, 926 P.2d 567 (Colo.1996).

■ The element of deliberation often must be proved through circumstantial or indirect evidence. Such evidence may include the use of a deadly weapon by the accused, the manner in which it was used, and the existence of animosity between the accused and the victim. The circumstances surrounding a victim's death may permit the reasonable inference that the defendant had sufficient time to exercise reflection and judgment concerning the act. *People v. District Court, supra.*

Here, there was testimony that: (1) the night before the murder, defendant had described the victim to a fellow inmate as

a "rat" and had expressed concern that the victim might expose to prison officials certain prohibited activities in which defendant was engaged; (2) because of his concern that he might be exposed, defendant had told a fellow inmate that they should beat up the victim; (3) defendant had earlier demonstrated to other inmates how to choke someone with a laundry cord; (4) defendant had told the victim's cellmate not to worry about his safety, that defendant would not let him get hurt, but that he should not spend too much time in his cell; (5) on the morning of the murder, defendant and another inmate had entered the victim's cell, and defendant had had a laundry cord wrapped around his wrist; (6) the knot made in the cord used in the murder was described as "made to stay," indicating that the person who had made the knot had to have spent time doing so; (7) defendant and another inmate had initially tried to hang the victim from a hook in the cell, but when that did not work defendant strangled the victim using the laundry cord; and (8) after the murder, defendant had told several inmates he was proud of having killed the victim.

Because the evidence, viewed as a whole and in the light most favorable to the prosecution, is more than ample to establish that defendant acted deliberately, we perceive no

basis for reversal.

Judgment affirmed.

Judge ROTHENBERG and Judge CASEBOLT concur.